## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARNY CARROLL | § | |
| PLAINTIFF, | § | Civil Action |
| | § | File No. _____ |
| | § | |
| V. | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| GENERAL MOTORS, LLC, | § | |
| DELPHI AUTOMOTIVE PLC, | § | |
| DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE | § | |
| SYSTEMS, LLC. | § | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff, through undersigned counsel, and for cause of action respectfully shows as follows:

### I.       PRELIMINARY STATEMENT

1.      Plaintiff's causes of action are brought against GENERAL MOTORS LLC ("New GM"), DELPHI AUTOMOTIVE PLC; and DPH-DAS LLC f/k/a DELPHI AUTOMOTIVE SYSTEMS, LLC. Plaintiff does not assert any causes of action against General Motors Corporation ("Old GM"). The incident at issue in this case occurred after the Old GM bankruptcy, which is discussed briefly below. The subject vehicle has been recalled by General Motors LLC, and New GM is strictly liable for the incident.

2.      While at times this Complaint references acts and omissions by Old GM, these references are for background purposes only. Although Old GM arguably ceased to exist pursuant to the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets. That Amended and Restated Master Sale and Purchase Agreement was approved on July 10, 2009. In that Agreement, New GM

expressly agreed to accept responsibility for product liability claims that arose from accidents or incidents occurring on or after July 10, 2009.  The incident that forms the basis of Plaintiff's claims occurred after July 10, 2009.

3.       While New GM expressly accepted responsibility for accidents occurring on or after July 10, 2009,  it also acquired knowledge of Old GM's activities generally, and the existence of the defective ignition switch in place in millions of vehicles specifically. New GM acquired personnel from Old GM, including but not limited to, top leadership personnel, executives, members of the Board of Directors, internal legal counsel, engineers and quality control personnel.  These employees carried with them the knowledge they gained at Old GM to New GM.  New GM also acquired knowledge about the issues with the ignition switch, moving stalls and airbag non-deployment through documents and reports to the Board of Directors and others.  New GM continued to service – and receive complaints about – vehicles manufactured on Old GM's watch.  While the change from Old GM to New GM certainly had some legal effect with regard to creditors, it had little practical effect relative to the problems with, and knowledge of, the ignition-switch defect.

4.       New GM also acquired certain duties with regard to vehicles in production and on the road at the time of the Sale and Purchase Agreement – duties it breached egregiously – as has been well-publicized and for which it has been justifiably criticized. These duties included, but are not limited to, those arising under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 *et. seq.* and the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§ 30101 – 30170.  GM was fined $35 Million by NTSHA for its delayed reporting of the ignition switch problem and violating federal safety laws.  New GM's liability for damages is attributable to its own post-sale conduct and failure to timely remedy

and/or recall vehicles it knew had deadly defects, even with regard to vehicles manufactured and sold prior to the Sale and Purchase Agreement. Plaintiff's case is a prime example of liability and gross negligence that is inarguably attributable solely to New GM, as is shown below.

## II.    INTRODUCTION

5.      At the time of this filing, more than 12,000,000 GM vehicles have been recalled because of a defective ignition switch.  Hundreds, if not thousands, of accidents are now known to have been caused by vehicles losing power and control because the defective ignition switch turned from "on" to "off" during normal and foreseeable operation. When the ignition switch fails, drivers are unable to use their steering and brakes in an effective manner. The resulting loss of control, or "moving stall," and subsequent accidents are exacerbated by the fact that the defective ignition switch also prevents life-saving airbags from deploying. So, in addition to causing accidents, the defective part makes the resulting damages even greater. As used in this Complaint, the "Subject Vehicles" refers to the GM vehicles manufactured, upon information and belief, on the certain "platforms," including but not limited to the "Delta" and  "Kappa" platforms, sold in the United States, equipped at the time of sale with ignition switches (the "Ignition Switches"), and sharing a common defective design, including the following makes and model years:

**Buick:**
- Lacrosse (2005 – 2009)
- Lucerne (2006 – 2011)

**Cadillac:**
- CTS (2003 – 2014)
- Deville (2000 – 2005)
- DTS (2006 – 2011)
- SRX (2004 – 2006)

**Chevrolet:**
- Camaro (2010 – 2014)
- Cobalt (2005 – 2010)
- HHR (2006 – 2011)
- Impala (2000 – 2014)
- Malibu (1997 – 2005)
- Monte Carlo (2000 – 2007)

**Oldsmobile:**
- Alero (1999 – 2004)
- Intrigue (1998 – 2002)

**Pontiac:**
- G5 (2007 – 2010)
- Grand Am (1999 – 2005)
- Grand Prix (2004 – 2008)
- Solstice (2006 – 2010)

**Saturn:**
- Ion (2003 – 2007)
- Sky (2007 – 2010)

6.     Plaintiff's 2007 Pontiac Grand Prix is included in the above-listed "Subject Vehicles" and contained the defective Ignition Switch that is the subject of the 2014 GM ignition switch recalls.     Plaintiff's vehicle, which bears the VIN number 2G2WR554X71211038, was in substantially the same condition as when it left the manufacturer and contained a defective ignition switch that was the proximate and producing cause of the incident at issue and Plaintiff's resulting injuries and damages.

7.     According to the recently published "Report to the Board of Directors of General Motors Company Regarding Ignition Switch Recalls" authored by Anton R. Valukas ("The Valukas Report"), GM made a conscious decision, in the fall of 2002, to use an ignition switch in the Subject Vehicles "that was so far below GM's own specifications that it failed to keep the car powered on in circumstances that drivers would encounter." Although the switch's inability to keep the car powered on during normal and foreseeable use of the subject vehicles "were

known within GM's engineering ranks at the earliest stages of its [the switch's] production,"

GM ignored the safety risks attendant to these "moving stalls." These risks include, but are not

limited to, sudden failure of: power steering, anti-lock brakes, electronic stability control, lane

departure warnings, navigation systems, and airbag deployment.  These sudden system failures

made the Subject Vehicles impossible to control and, once the inevitable accident occurred, left

the driver and passengers without life-saving airbags.

8.      Apparently, GM viewed the defective ignition switches as a convenience issue as

opposed to a safety issue and, inexplicably, failed to link the power failure with a failure to

allow airbags to deploy in a resulting accident.

9.      Also according to The Valukas Report:

> "While GM heard over and over from various quarters – including
> customers, dealers, the press and their own employees – that the
> car's ignition switch led to moving stalls, group after group and
> committee after committee within GM that reviewed the issue
> failed to take action or acted too slowly. Although everyone had
> responsibility to fix the problem, nobody took responsibility. It
> was an example of what one top executive described as the "GM
> nod," when everyone nods in agreement to a proposed plan of
> action, but then leave the room and does nothing."

10.     According to documents obtained by a House of Representatives Committee

during an investigation into the Defective Ignition Switches, GM opened an engineering inquiry

about the defective Ignition Switch in 2004 after customers complained that the Subject

Vehicles could be turned off while driving.  Also according to those documents, the Cobalt

program engineer rejected a proposal to change the Ignition Switch claiming that the part was

too expensive and the change would take too much time – after he experienced the same

problem while performing a test drive of a Cobalt.  The cost that the project engineer found

intolerably high was less than one dollar per vehicle.  GM continued using the switches in

vehicles, as evidenced by the year models of the recalled Subject Vehicles, until 2013 and installed the switches it knew to be defective into 2014 model-year vehicles.  GM put millions of live at risk to save a dollar, literally.

11.     Although GM was aware (after the Purchase and Sale Agreement with Old GM) of the problem with the switches, the link between the defect and airbag non-deployment, hundreds of accidents, and dozens of acknowledged deaths attributable to the defective ignition switches, GM did not even begin recalling the Subject Vehicles until 2014.   Not even the solution is attributable to GM – it was a plaintiff attorney's investigator that finally disassembled the defective part and discovered the problem that GM had been incapable of discovering for a dozen years.

12.     Instead of accepting the defects in the Subject Vehicles and Ignition Switches as real safety issues, GM publically denied that either was a problem.   Instead of working to identify and correct the problem, GM, its directors, engineers and counsel devoted their efforts to minimizing the perceived frequency and pervasiveness of the problems.  Instead of accepting responsibility for the incidents and tragedy it caused, Defendants focused on "defending the brand" and public relations.  Defendants knew, or in the exercise of the most basic diligence, should have known that a defect that causes system-wide failure of key components presented a significant safety risk to the public.

13.     As a result of GM's negligent, reckless, and malicious conduct, Plaintiff owned and operated a vehicle with a defective ignition switch, described by the designing engineer as "the switch from hell." As Plaintiff was driving her vehicle in Washington D.C. on November 11, 2011 a car cut in front of her.  Her vehicle experienced a "moving stall" that prevented her from steering or stopping her car, which made it impossible to avoid the collision.  She collided

with the other vehicle and suffered serious injuries.  And, because her ignition switch was in the "accessory" or "off" position, her airbags failed to deploy, exacerbating her injuries.  But-for the defective ignition switch, the incident would not have occurred, and Plaintiff would not have been injured.

## III.    PARTIES

14.    Plaintiff Marny Carroll is a resident of Washington, D.C.

15.    Defendant General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business at 300 Renaissance Center, MC: 482-C14-C66, Detroit, Michigan 48265 and may be served with process through service on its designated agent for service of process, Corporation Service Company, 1090 Vermont Ave. NW, Washington, DC 20005.  At all times relevant herein, General Motors Corporation and its successor in interest GENERAL MOTORS LLC were engaged in the business of designing, manufacturing, constructing, assembling, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Subject Vehicle, as described in this Complaint, and other motor vehicles and motor vehicle components throughout the United States. General Motors LLC has sufficient contacts with Washington, D.C., such that under the Washington D.C. Long-Arm Statute, *D.C. Code Ann. § 13-423 et. seq.* it is subject to, and has submitted to, the jurisdiction of this Court.

16.    Defendant DELPHI AUTOMOTIVE PLC ("Delphi") is headquartered in Gillingham, Kent, United Kingdom, and is the parent company of Delphi Automotive Systems LLC, which is headquartered in Troy, Michigan.  Delphi does business in the District of Columbia, and can be served via its Registered Agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Delphi has sufficient

contacts with Washington, D.C., such that under the Washington D.C. Long-Arm Statute, *D.C. Code Ann. § 13-423 et. seq.* it is subject to, and has submitted to, the jurisdiction of this Court. Upon information and belief, at all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the ignition switches contained in the Subject Vehicles.

17.     DPH-DAS LLC f/k/a Delphi Automotive Systems, LLC ("Delphi") is a Michigan corporation with its headquarters in Troy, Michigan. Delphi does business in the District of Columbia and can be served via its Registered Agent at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Delphi has sufficient contacts with Washington, D.C., such that under the Washington D.C. Long-Arm Statute, *D.C. Code Ann. § 13-423 et. seq.* it is subject to, and has submitted to, the jurisdiction of this Court. Upon information and belief, at all times relevant herein, Delphi, through its various entities, designed, manufactured, and supplied GM with motor vehicle components, including the ignition switches contained in the Subject Vehicles.

## IV.     JURISDICTION AND VENUE

18.     Jurisdiction is proper in the United States District Court for the District of Columbia because there exists complete diversity of the parties pursuant to 28 U.S. Code §1332 and the matter in controversy exceeds $75,000, exclusive of interest and costs.

19.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S. Code §1391 (b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this Judicial District and Defendants are subject to the Court's personal jurisdiction.

## V.     CAUSES OF ACTION

A.      **Strict Product Liability**

20.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

21.     GM manufactured Plaintiff's vehicle. GM has admitted publically, through its recall of the Subject Vehicles that Plaintiff's vehicle contained a defect – namely the faulty ignition switch described above. In addition to GM's admission (through the recall and elsewhere) of the existence of the defective Ignition Switch, several studies have concluded that the Ignition Switch at issue is defective, results in "moving stalls," and airbag non-deployment in crashes.[1]

22.     The ignition switch was a substantial factor in bringing about Plaintiff's accident and resulting injuries. Not only did the ignition switch render the car uncontrollable and cause the incident, but the defective switch also prevented the airbags from deploying.

23.     At all times relevant to this action, Plaintiff was using her vehicle in a proper and foreseeable manner and as it was intended by Defendants to be used when Defendants designed, manufactured, marketed, warranted, and sold the vehicle. Plaintiff's vehicle had not been substantially modified or altered from the condition in which she bought it until the time of the incident that forms the basis of this suit.

24.     Plaintiff could not, through the exercise of reasonable care, have discovered the defect in the Ignition Switch and perceived its danger, nor could she have, through the exercise of reasonable care, avoided the incident that caused her injuries.

25.     Upon information and belief, the defective component was manufactured to the specification to which it was designed. According to the Valukas Report, the design itself was so

---

[1]      *See, e.g.* Indiana Transportation Research Center Report, April 25, 2007, GMNTHSA000223985; Keith A. Young, Technical Reconstruction Unit, Wisconsin State Patrol Academy, Collision Analysis & Reconstruction Report Feb. 14, 2007 at GMNTHSA000284395; Erin Shipp's Engineer Report at GMNHTSA000309665.

far below GM's specifications that it failed to keep Plaintiff's vehicle powered on during the normal conditions she encountered on the day of the incident.

26. GM marketed Plaintiff's vehicle, the Subject Vehicles, and Ignition Switches that were designed so that they were not reasonably safe in that they rendered the Subject Vehicles uncontrollable and prevented airbag deployment in a crash. The design of the Ignition Switches and Subject Vehicles was such that the utility of those products did not outweigh the danger of their introduction into the stream of commerce.

27. At the time the Subject Vehicles and the Ignition Switches were produced, there existed, and GM was aware of, cost-effective safer alternative designs that were both feasible and would have made the Subject Vehicles and Ignition Switches safer. Moreover, the safer alternative design would not have impaired the usefulness of the Ignition Switches and Subject Vehicle.

28. These design defects were the producing and proximate cause of Plaintiff's accident and resulting injuries.

29. Defendants also failed to warn the public, and Plaintiff specifically, of the inherent defects in the Subject Vehicles, the Ignition Switches, and Plaintiff's car specifically. Defendants did not inform the public of these life-threatening defects until 2014 – after Plaintiff's accident. Had Defendants warned Plaintiff that the vehicle she was driving could experience a "moving stall" during normal operations and/or that the airbags would not deploy in a crash, Plaintiff would not have bought or continued to operate her vehicle in that defective condition. Defendants' failure to warn Plaintiff regarding the true capabilities, defects, and limitations of her vehicle was the producing and proximate cause of Plaintiff's incident and resulting injuries.

30.     Defendants knew, or through the exercise of reasonable care, should have known of the defects, capabilities, and limitations of the Subject Vehicles and the Ignition Switches during intended and foreseeable use. This fact has been borne out in the Valukas Report and will doubtlessly be bolstered during discovery in this case. The mounting evidence makes it clear that, not only were Defendants aware of these defects, they were consciously indifferent to the high risk of grievous harm intendant to the "ignition switch from hell." Defendants gave no warning, much less an adequate warning, that the Subject Vehicles could experience a "moving stall" or that the airbags would fail to deploy as they should. The only adequate warning Defendants could possibly have given would have been to direct consumers to immediately cease to operate the Subject Vehicles. Defendants eventually recalled the Subject Vehicles, but much too late to be of any help to Plaintiff.

**B.      Negligence**

31.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

32.     Defendants owed a duty of care to the public, and to Plaintiff specifically, to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

33.     Moreover, Defendants were required by a host of state and federal regulations to design, manufacture, market, warrant, and sell vehicles that were free from dangerous defects and that were capable of being operated safely during normal and foreseeable use.

34.     Defendants had a duty to timely discover and remedy defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, that rendered them abnormally dangerous during normal and foreseeable use.

35.     Defendants breached the above-cited duties in at least the following respects:

a.     Failing to design an ignition switch that maintained a vehicle in an operational condition during normal and foreseeable use of the vehicle;

b.     Failing to discover defects in the Subject Vehicles, and in Plaintiff's vehicle specifically, in a timely manner;

c.     Marketing and selling vehicles that could, and did, experience "moving stalls" during normal and foreseeable use;

d.     Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience "moving stalls" during normal and foreseeable use of the vehicles;

e.     Failing to warn the public, and Plaintiff specifically, that the Subject Vehicles could and did experience airbag non-deployment during crashes in which the airbags should deploy;

f.     Failing to implement proper surveillance procedures to identify, track, and account for incidents related to the failure of the Ignition Switches;

g.     Ignoring incidents and reports that would have led a reasonable manufacturer of vehicles and components to recall and/or remedy defects in the Subject Vehicles;

h.     Allowing vehicles to be placed in the stream of commerce that Defendants knew or should have known suffered from potentially deadly defects; and

i.     Failing to timely recall the Subject Vehicles when it became apparent, or should have been apparent through the exercise of reasonable care and/or diligence, that crashes were being caused and exacerbated by the faulty

Ignition Switches.

36.     Defendants' breaches of duty in both common law and statute were the producing and proximate cause of the incident at issue and Plaintiff's damages. Plaintiff belonged to the class of persons meant to be protected by the state and federal regulations breached by Defendants.

**C.     Breach of Express and Implied Warranties; Deceptive Trade Practices**

37.     The preceding paragraphs are hereby incorporated by reference as if set forth in full here.  Plaintiff hereby brings suit pursuant, but not limited, to the District of Columbia D.C. Code § 28-3901 et. seq. "The D.C. Deceptive Trade Practices Act."

38.     The incident in which Plaintiff was injured was caused by the defective Subject Vehicle and Ignition Switch as described herein. Plaintiff was a consumer who did, and reasonably could have been expected to, use and/or be affected by the Subject Vehicles.  Plaintiff purchased the vehicle at issue in this case, and there existed privity of contract as that term is known at law.

39.     The incident at issue occurred, and Plaintiff was injured, because her vehicle and ignition switch were defective, as described herein, in that they were not safe for normal and foreseeable use.

40.     Defendants expressly and impliedly warranted that the Subject Vehicles would not shut off during normal and foreseeable use, that the Subject Vehicles could be safely operated during normal use, that the essential functions of the Subject Vehicles would remain operable during foreseeable use, and that the airbags would deploy in the case of a crash in which one would normally expect the airbags to deploy.

41.     Because of the defects described herein, in various public reports, and as admitted

by Defendants themselves, these (and other) express and implied warranties were breached by Defendants. The Subject Vehicles, and Plaintiff's vehicle specifically, were not fit for the ordinary purposes for which such vehicles are used nor were they fit for the specific purpose Defendants represented them to be useful for.

42.    Defendants' acts and omissions were deceptive in that the Subject Vehicles and Ignition Switches were advertised and warranted to possess qualities, characteristics and protections that they did not, in fact, possess.  The Subject Vehicles and Ignition Switches were represented to be of a particular standard, quality and grade, free from defects, of merchantable quality and fit for the purpose for which they were sold and they were not.

43.    Defendants' breaches of warranty were the producing and proximate cause of the incident at issue and Plaintiff's damages.

**D.    Gross Negligence**

44.    The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

45.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that Defendants are guilty of exceptional misconduct. GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration.  Defendants have been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes onto American streets and highways – with unsuspecting consumers inside.  Defendants knew about the problem for years and, because of greed and/or

gross ineptitude, refused to act on the problem.   Instead, Defendants gave the issue the "GM nod."  The "GM nod" demonstrates that more than one of Defendants' superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct.   These officers acted maliciously, wantonly, and/or recklessly, and clearly the Defendants are guilty of exceptional misconduct and gross negligence.   Plaintiff demands punitive damages for this conduct.

## VI.   DAMAGES

46.   The preceding paragraphs are hereby incorporated by reference as if set forth in full here.

47.   Plaintiff, as a result of the liability of Defendants described above, has suffered and makes claim for reasonable and necessary medical expenses incurred as a result of the incident made basis of this suit in the past and future, past and future pain and suffering, lost wages in the past, and exemplary damages.   Plaintiff also demands statutory penalties be imposed pursuant to the D.C. Deceptive Trade Practices Act and attorney's fees.

## VII.   CONCLUSION AND PRAYER

48.   Defendants have only recently admitted publically their wrongdoing – albeit not to the full extent and not in time to prevent Plaintiff's injuries – but they admitted wrongdoing nonetheless.   As the evidence mounts about what was known and when, it is becoming inescapably clear that Defendants need to be punished and the victims they have injured need to be compensated. The law is powerless to remedy the harms Defendants have caused through their negligent, reckless, and malicious conduct – we cannot restore life or limb.   However, justice must be done to the extent we are able, and Plaintiff demands that Defendants answer for their acts and omissions that led to Plaintiff's and be required to pay compensatory and

exemplary damages to the full extent allowed by law.

49.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests Defendants be cited, tried by jury, and, upon verdict in Plaintiff's favor, Judgment be entered against Defendants, jointly and severally, for:

    a.    Actual damages within the jurisdictional limits of this Court;

    b.    Property damage and loss;

    c.    Exemplary damages to the full extent permitted by law;

    d.    Attorney's fees;

    e.    Costs of suit;

    f.    Pre- and Post-Judgment Interest at the maximum recoverable level; and

    g.    All other relief to which the Plaintiff shows himself justifiably entitled.

**Dated:**     November 6, 2014

Respectfully Submitted,

By: _____

Christopher T. Nidel, Esq.
Washington D.C. Bar No. 497059
**NIDEL LAW, P.L.L.C.**
1615 New Hampshire Ave., N.W.
Washington, D.C. 20009
202.558.2030 Voice


**HEARD ROBINS CLOUD LLP**
Derek S. Merman
Texas State Bar No. 24040110
2000 West Loop South, 22nd Floor
Houston, Texas 77027
713.650.1200 Voice
713.650.1400 Facsimile
*Attorneys for Plaintiff*